


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4-24CR-306-P |
| JAMES FLORES (01) | |

## INFORMATION

The United States Attorney charges:

At all times material to this Information:

### Background

1.  The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

2.  In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (Small Business

**Information – Page 1**

Administration ("SBA") Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

3.  A PPP loan application was processed by a participating lender. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan. In return for processing PPP loans, the SBA paid these lenders a processing fee.

4.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

The Defendant, Related Entities, and Individuals

5.  Lender-1 was a Community Development Financial Institution ("CDFI") headquartered in Phoenix, Arizona and a PPP lender.

6.  Lender-2 was a CDFI headquartered in Bedford, Texas and a PPP lender.

7.  Lender-3 was a small business lender that participated in the PPP program and was headquartered in San Diego, California.

8. Lender-4 was a small business lender that participated in the PPP program and was headquartered in San Francisco, California.

9. Lender-5 was a small business lender that participated in the PPP program and was headquartered in Redwood City, California.

10. Bank-1 was a financial institution headquartered in Happy, Texas whose deposits were insured by the Federal Deposit Insurance Corporation. Bank-1's computer servers that stored records of bank transactions were located in the Northern District of Texas. In 2021, Bank-1 received funds sent from the Federal Reserve Bank into an account held by Lender-2, which was then disbursed to fund PPP loans.

11. Blueacorn refers to a number of entities that were used in 2020 and 2021 to process PPP loans. Beginning in 2021, Blueacorn collected and reviewed PPP loan applications as a lender service provider on behalf of Lender-1 and Lender-2.

12. Nathan Reis lived in Arizona and cofounded and co-owned Blueacorn. He was also, at times, the Chief Executive Officer of Blueacorn. He sold his ownership interest in 2021.

13. Stephanie Hockridge a.k.a. Stephanie Reis lived in Arizona and cofounded and co-owned Blueacorn. She sold her ownership interest in 2021. Hockridge and Reis were married.

14. Michael Cota was a separately charged coconspirator who lived in Arizona and co-owned a company called Qualytics.

15. Vivian Arriaga was a separately charged coconspirator who lived in Arizona and co-owned Qualytics.

16. **James Flores** lived in Arizona and was a business partner of Reis, Hockridge, Cota, and Arriaga. **Flores** cofounded and co-owned both Blueacorn and Qualytics.

**[Remainder of page intentionally left blank]**

Count One
Conspiracy to Commit Wire Fraud
(Violation of 18 U.S.C. § 1349, 18 U.S.C. § 1343)

17.     Paragraphs 1 through 16 of this Information are realleged and incorporated.

18.     From in or around April 2020, through in or around May 2021, in the Fort Worth Division of the Northern District of Texas and elsewhere, defendant **James Flores**, along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to commit wire fraud, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice and attempting to do so, caused to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

Purpose of the Conspiracy

19.     The purpose of the conspiracy was for **Flores**, Reis, Hockridge, Cota, Arriaga, and others to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent applications for forgivable PPP loans.

Manner and Means of the Conspiracy and Scheme to Defraud

20.     The manner and means by which **Flores** and his coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

a. Beginning in or around April 2020, **Flores** and his coconspirators began submitting fraudulent applications for PPP loans for themselves and their businesses. **Flores** and his coconspirators fabricated tax documents, doctored bank statements, and made other material misrepresentations in order to deceive lenders and the SBA into issuing loans in amounts for which applicants were not eligible.

b. Beginning in or around April 2020, **Flores** and his coconspirators founded Blueacorn, purportedly to assist small businesses and individuals in obtaining PPP loans. In order to obtain larger loans for certain PPP applicants, **Flores** and other coconspirators fabricated documents, including payroll records, tax documentation, and bank statements.

c. Beginning in or around October 2020, **Flores** and his coconspirators expanded Blueacorn's operations through a lender service provider agreement ("LSPA") with Lender-2. Under the LSPA, Blueacorn collected and reviewed applications from potential borrowers on behalf of Lender-2 and worked with Lender-2 to submit applications to the SBA. In or around April 2021, Blueacorn entered a similar LSPA with Lender-1. Under these agreements, Blueacorn received a percentage of the fees the SBA paid to Lender-1 and Lender-2 for approved PPP loans. **Flores** and his coconspirators submitted and caused to be submitted PPP loan applications

        that they knew contained materially false information in order to make more money.

    d. **Flores** and his coconspirators also made money through a Blueacorn program called "VIPPP" in which they offered a personalized service to help potential borrowers complete PPP loan applications. Reis and Hockridge recruited coconspirators to work as VIPPP referral agents and coach borrowers on how to submit false PPP loan applications. In exchange for their service, Reis, Hockridge, and their coconspirators charged VIPPP borrowers kickbacks based on a percentage of their loans that were funded, despite knowing that borrowers were prohibited from using PPP loan proceeds to make such payments. In order to obtain a greater volume of kickbacks from borrowers and fees from the SBA, **Flores**, Reis, Hockridge, and their coconspirators submitted PPP loan applications that they knew contained materially false information.

21. **Reis, Hockridge**, and their coconspirators also took the following steps, among others, to carry out their conspiracy and scheme to defraud:

    a. In or around May 2020, **Flores** and Cota applied to Lender-3 for a PPP loan for Qualytics in the amount of $62,610. The loan application falsely represented the amount of payroll that Qualytics paid in 2019, knowing that Qualytics did not qualify for the loan amount.

b. On or about May 15, 2020, Cota digitally signed the promissory note through which Qualytics obtained a PPP loan in the amount of $62,610 and sent the note via electronic wire to Lender-3.

c. In or around July 2020, Reis contacted **Flores**, Cota, and Arriaga and offered to help them apply for additional PPP loans.

d. Thereafter, in or around July 2020, Reis and Cota helped **Flores** submit a materially false loan application to Lender-4 for a PPP loan in the amount of about $20,006. That application falsely represented that **Flores** maintained a sole proprietorship in his own name. As part of the application, Reis created a fake tax document purporting to show that the company paid **Flores** over $106,000 in 2019, and Cota created a false bank statement for **Flores**.

e. In or around August 2020, **Flores** used these fabricated documents to submit another PPP loan application, again falsely representing that **Flores** maintained a sole proprietorship in his own name, and also seeking a loan in the amount of about $20,0006, to Lender-5.

f. In or around February 2021, Arriaga obtained a second-draw PPP loan from Lender-2 through Lender Service Provider-1 with guidance and assistance from **Flores** and Cota. The application falsely represented that Arriaga maintained a sole proprietorship and falsely represented the monthly payroll for that purported business.

g. On or about February 5, 2021, Arriaga digitally signed the application form for a PPP loan in the amount of about $20,833, causing Lender-2, located in or around Bedford, Texas, in the Northern District of Texas, to disburse the loan proceeds to a bank account located outside the state of Texas.

All in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1343).

**[Remainder of page intentionally left blank]**

## Forfeiture Notice
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

22.   The allegations of this Information are hereby realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **James Flores**, has an interest.

23.   Upon conviction of the offenses in violation of Title 18, United States Code, Section 1349, as alleged in this Information, the defendant, **James Flores**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

24.   If any of the property described above, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c).

LEIGHA SIMONTON
UNITED STATES ATTORNEY

MATTHEW WEYBRECHT
Assistant United States Attorney
State Bar of Texas No. 24102642
Telephone: 817-252-5200
Fax: 817-252-5455
Email: matthew.weybrecht@usdoj.gov

MARGARET A. MOESER
CHIEF, MONEY LAUNDERING & ASSET
RECOVERY SECTION
Criminal Division, U.S. Department of Justice

/s/ *Elizabeth R. Carr*
ELIZABETH R. CARR
RYAN MCLAREN
Trial Attorneys, Money Laundering & Asset
Recovery Section
Criminal Division, U.S. Department of Justice
Telephone: 202-875-1535
Email: Elizabeth.carr@usdoj.gov
GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division, U.S. Department of Justice

/s/ *Philip Trout*
PHILIP TROUT
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
Telephone: 202-616-6989
Fax: 202-514-0152
Email: Philip.Trout@usdoj.gov